**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
----------------------------------x
SECURITIES AND EXCHANGE COMMISSION,:
                                   :
      Plaintiff,                   :
                                   :
v.                                 : Civil No. 3:07CV1910(AWT)
                                   :
JOSEPH F. APUZZO,                  :
                                   :
      Defendant.                   :
----------------------------------x
```

## RULING ON MOTION TO DISMISS

The Securities and Exchange Commission (the "SEC") brings this action pursuant to §§ 21(d) and 21(e) of the Exchange Act, 15 U.S.C. § § 78u(d) and (e), against Joseph F. Apuzzo ("Apuzzo"), the former chief financial officer of Terex Corporation ("Terex"), alleging that he aided and abetted a fraudulent accounting scheme involving two sale-leaseback transactions and carried out between 2000 and 2002 by United Rentals, Inc. ("URI") and its former chief financial officer Michael J. Nolan ("Nolan") and others.  Apuzzo has moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth below, the motion is being granted.

## I.   FACTUAL BACKGROUND

Terex manufactures equipment primarily for the construction, infrastructure, and surface to mining industries.  Apuzzo was the chief financial officer of Terex from October 1998 to September 2002, when he left the company to become president of Terex

-1-

Financial Services, a division of Terex. He was president of Terex
Financial Services until August 2005. Apuzzo was a licensed CPA
during part of the time that he worked at Terex, has an MBA in
Public Accounting, and had previously worked at a public accounting
firm.

URI is one of the largest equipment-rental companies in the
world. During the relevant time period, URI regularly purchased
equipment from Terex and rented it to other companies. Nolan was
URI's chief financial officer from its inception in September 1997
until December 2002.

The SEC alleges that URI and Nolan committed securities fraud
by improving URI's 2000 and 2001 financial results by inflating the
profit generated from the sale of used equipment and recognizing
prematurely revenue from those sales of equipment to General
Electric Capital Corporation ("GECC") and that concealing the true
structure of the two transactions from URI's auditor was part of
the fraudulent scheme. The two transactions at issue involved
equipment sale-leasebacks, with remarketing agreements and residual
value guarantees related to the equipment.

The SEC alleges that Nolan and others purported to structure
the deals as "minor sale-leasebacks" so that URI could take
advantage of certain favorable accounting treatment. According to
the SEC, URI sold used equipment to GECC at prices in excess of its
fair market value and then leased it back. To induce GECC to

participate in the transactions, URI paid it a fee and arranged with Apuzzo to have Terex enter into remarketing agreements with GECC pursuant to which Terex agreed to resell the equipment at the end of the lease period and guaranteed that GECC would receive no less than 96% of the purchase price it had paid URI for the equipment (the "residual value guarantee"). In consideration for the residual value guarantees for the benefit of GECC, URI entered into backup remarketing agreements with Terex, under which URI assumed Terex's remarketing obligations and guarantees to GECC and agreed to indemnify Terex for any losses, and URI also agreed to make additional purchases of new equipment over and above the historical level of URI's purchases from Terex. The indemnification payments by URI to Terex were concealed through the use of inflated invoices that disguised the indemnification payments as undisclosed premiums on URI's purchase of new equipment from Terex. Thus, each transaction involved a series of interlocking agreements between URI and GECC, GECC and Terex, and Terex and URI. The first of the two sets of transactions ("Terex I") took place in December 2000. The second ("Terex II") took place in December 2001.

Because Nolan and others purported to structure the transactions on behalf of URI as minor sale-leasebacks, under Generally Accepted Accounting Principles ("GAAP") URI was allowed to recognize immediately the profit generated by the sales of the

used equipment to GECC only if, among other criteria, the risks and rewards of ownership were transferred to GECC.  In addition, GAAP requires that before revenue from the sale of equipment can be recognized, the sale price must be fixed and determinable.  If any commitments related to the sale remain unsettled, the sale price is not deemed to be fixed and determinable, and any gain from the sale must be deferred until the commitments are settled.

The SEC alleges that because URI, acting through Nolan and others who dealt with Apuzzo, had agreed to indemnify Terex for losses it would incur under its remarketing agreements with GECC, URI's obligations relating to the sale-leaseback agreements were not complete in the reporting period in which the agreements were executed.  As a result, URI was prohibited under GAAP from recording revenue from the sales in each of those reporting periods.  "Nolan and others were able to prevent discovery of URI's continuing obligations under the three-party agreements because they engaged in a concerted effort to hide the interlocking [nature of the] agreements from URI's independent auditor."  Complaint (Doc. No. 1) ("Compl.") ¶ 14.  "In addition, Nolan and others were also able to inflate the gains that URI recorded because they were able to hide the indemnification payments URI made to Terex."  Id. As a result of the fraudulent accounting, the financial statements and results that URI incorporated into its periodic filings and other materials disseminated to the investing public were

materially false and misleading.  By fraudulently characterizing the Terex I and Terex II transactions as minor sale-leasebacks and inflating the profit on each transaction, Nolan and others materially overstated URI's profits and allowed the company to meet its earnings guidance and analyst expectations for the fourth quarter and full year 2000 and for the fourth quarter and full year 2001.

The complaint in this action against Apuzzo alleges that he substantially assisted URI, Nolan and others in their efforts to disguise the interlocking nature of the agreements and to conceal the indemnification payments URI made to Terex.  In both 2000 and 2001, Apuzzo signed agreements with URI and/or GECC that disguised URI's continuing risks and financial obligations under the three-party transactions.  In addition, with Apuzzo's knowledge and/or approval, Terex issued inflated invoices in connection with URI's purchase of new equipment from Terex that concealed URI's indemnification payments to Terex and thus allowed URI to inflate its profits on the sale-leaseback transactions.[1]

---

[1]Also, the SEC alleges in paragraph 2 of the Complaint that:

Apuzzo substantially assisted URI and Nolan in implementing the fraudulent scheme by, among other things, signing agreements with URI that he knew or was reckless in not knowing were designed to hide URI's continuing risks and financial obligations relating to the sale-leaseback transactions, directing or approving the issuance of inflated invoices that he knew or was reckless in not knowing URI, through Nolan and others, would use to inflate URI's gain on the transactions, and facilitating URI's concealment of fee payments to a third-party through undisclosed financial

**Terex I**

In the later part of 2000, Nolan contacted GECC about a short-term sale-leaseback transaction that would allow URI to record an immediate gain. GECC advised Nolan that it would not enter into a sale-leaseback transaction with URI unless a third party agreed to remarket the equipment at the end of the lease period and to provide a guarantee with respect to the residual value of the equipment. Nolan was also informed that GECC would charge URI a fee for participating in the transaction.

Nolan and others initiated discussions with Terex, which was one of URI's vendors. Nolan explained the terms of the proposed transaction to Apuzzo, who expressed a willingness to participate as long as URI (1) agreed to indemnify Terex with respect to any losses Terex might incur as a result of providing a residual value guarantee to GECC, and (2) made additional new equipment purchases from Terex in the current fiscal year in order to boost Terex's year-end financial results.

On December 29, 2000, URI executed a Master Lease Agreement with GECC pursuant to which URI sold a fleet of used equipment to GECC for $25.3 million and leased the equipment back for a period

---

arrangements between Terex and the third-party.

Compl. ¶ 2. However, there is no factual allegation that Apuzzo issued inflated invoices to URI in connection with URI's sale of the used equipment to GECC, as opposed to inflated invoices in connection with Terex's sale of new equipment to URI.

of eight months.  Simultaneously, GECC and Terex entered into a remarketing agreement, signed on behalf of Terex by Apuzzo, pursuant to which Terex agreed to remarket the equipment at the end of the lease period and to pay GECC the amount of any shortfall between the residual value guarantee (which was no less than 96% of the price paid by GECC) and the proceeds generated by the resale of the equipment.  Terex also agreed that, at GECC's option, Terex would buy, at its guaranteed residual value, any equipment that remained unsold at the end of the remarketing period.  In addition, as a result of negotiations between Apuzzo, Nolan and others, URI agreed to purchase from Terex approximately $20 million of new equipment before the end of the 2000 calendar year, and to pay Terex approximately $5 million immediately to cover Terex's anticipated losses on account of the residual value guarantee.  In accordance with the agreement between Apuzzo, Nolan and others, URI and Terex also executed a "backup" remarketing agreement, which Apuzzo also signed on behalf of Terex, under which URI effectively assumed Terex's remarketing obligations and residual value guarantee to GECC and agreed to cover any losses to Terex exceeding the $5 million advance payment by means of guaranteed future purchases.

Apuzzo sent Nolan an initial draft of the proposed backup remarketing agreement.  That initial draft explicitly described Terex's residual value guarantee to GECC.  It also recited URI's

agreement to remarket the equipment as well as indemnify Terex for any losses it incurred as a result of the residual value guarantee. However, in response to Apuzzo's initial draft of the backup remarketing agreement, Nolan and others sent Apuzzo a revised draft that deleted all explicit references to GECC and to URI's agreement to remarket the equipment. Instead, URI's revised draft referred to URI's obligation to remarket equipment "which is typically in United Rentals rental fleet and is then owned by a leasing company which is not less than investment grade, and is required to be remarketed by Terex from such leasing company for a period commencing in August, 2001." Compl. ¶ 21. Nowhere in URI's revised draft was there any language identifying the leasing company or mentioning the fact that the equipment to be remarketed was equipment URI had sold to GECC. Instead of referring to the residual value guarantee from Terex to GECC, URI's revised draft referred to URI's guarantee to pay Terex "the total cost incurred or that would be incurred by Terex to purchase such equipment. . . ." Id.

Before committing Terex to the residual value guarantee, Apuzzo obtained an internal appraisal of the used equipment URI was selling to GECC. Based on that appraisal, Apuzzo knew that Terex's agreement to guarantee GECC at least 96% of the valuation URI had placed on the equipment would likely cause Terex to incur substantial losses when the equipment was resold. Consequently,

Apuzzo insisted that URI agree to indemnify Terex against any such loss.  When Apuzzo signed the remarketing agreement, he understood that, although it would likely result in millions of dollars in losses to Terex for which Terex expected be indemnified by URI, URI's commitment to indemnify Terex for such losses was set forth in a separate document that failed to make any explicit reference to the remarketing agreement, the residual value guarantee, or even the transaction to which it related.

Apuzzo was later asked to provide a valuation letter to URI's auditor representing that URI had assigned fair market valuations to the equipment sold to GECC.  The SEC alleges that "[i]nstead, Apuzzo offered to provide an appraisal letter that not only failed to disclose the appraisal values that Terex had determined, but affirmatively and misleadingly asserted that 'nothing has come to [his] attention' to cause Apuzzo to believe that the overall equipment valuations regarding the equipment 'could not be achieved in a transaction between a willing buyer and willing seller.'" Compl. ¶ 26 (emphasis added).

URI agreed to purchase $20 million of new equipment from Terex and to pay Terex before year-end 2000 if the equipment could be delivered in 2001 rather than immediately.  Apuzzo agreed to this and, in addition, provided assurances to Nolan and others that URI could substitute different equipment if necessary, or otherwise return equipment for full credit if URI subsequently determined

that it did not need the equipment. Under GAAP, because Terex was unable to deliver the new equipment to URI before December 31, 2000, Terex could immediately recognize the revenue from the sale to URI if the transaction complied with "bill and hold" accounting guidance. Among other things, Apuzzo's agreement to allow URI to substitute or return equipment did not comply with "bill and hold" requirements.

Apuzzo was able to avoid fully disclosing the terms of his agreement with Nolan and others. No purchase agreement was prepared between Terex and URI, and URI did not issue any purchase orders. In addition, while Nolan and others reduced to writing URI's "right of return" on the new equipment it was purchasing and sent it to Apuzzo along with the backup remarketing agreement, the document was described as a "Separate Agreement" and was not part of the backup remarketing agreement, which was signed by Apuzzo on behalf of Terex.

URI made two lump-sum indemnification payments to Terex in connection with Terex I. An initial payment of $5 million was made simultaneously with the execution of the documents for the transaction. The second payment was made on January 2, 2003, after a final reconciliation of the numbers had been performed by GECC, Terex and URI. Apuzzo and Nolan agreed that URI's indemnification payments to Terex would be made as undisclosed "premiums" paid in connection with URI's purchase of new equipment from Terex.

In accordance with the agreement between Apuzzo, Nolan and others, the initial $5 million indemnification payment was made in connection with URI's agreement to purchase approximately $20 million of new equipment from Terex before the end of the 2000 calendar year. On December 29, 2000, with Apuzzo's knowledge and approval, Terex issued two invoices that reflected an aggregate price of $25 million for new equipment that Terex internally valued at $20 million. Notwithstanding the prices shown on the invoices, with Apuzzo's knowledge and approval, Terex recorded only $20 million of the $25 million as revenue for 2000 and recorded the $5 million overpayment as a reserve to be used to cover Terex's anticipated losses under its residual value guarantee. Contemporaneously, Nolan forwarded the inflated invoices to URI's accounting department, knowing that the accounting department would enter the incorrect prices in URI's books and records.

Following URI's payment of $25 million to Terex on December 29, 2000, Apuzzo improperly recorded the $20 million portion of the payment as revenue for the fiscal year-ending December 31, 2000. Apuzzo was able to do so by not fully revealing the terms of the agreement with URI, which did not comply with "bill and hold" requirements.

During 2001 and 2002, as an industry recession continued, URI and Terex were unable to resell the equipment at or near the residual value that had been guaranteed to GECC. In fact, losses

exceeded the initial estimated $5 million shortfall. Towards the end of 2002, following extensions of the remarketing period provided for in the remarketing agreement, GECC prepared a final reconciliation with respect to Terex's obligations under the residual value guarantee. Simultaneously, Terex and URI prepared a final reconciliation with respect to URI's obligations under the backup remarketing agreement.

On December 31, 2002, Apuzzo signed a "Contract" between URI and Terex which purported to extend the remarketing and purchase agreements between the two companies that would otherwise expire. The Contract provided that URI would make an $8 million "prepayment," to be applied as a "surcharge" on the additional purchase of equipment from Terex during the following six months. The Contract provided that Terex could keep the prepayment even if URI failed to make the additional purchase.

On January 2, 2003, GECC sent an email to both Apuzzo and URI notifying them that a reimbursement for approximately $8.3 million was to be paid that day to GECC. Terex paid that amount to GECC, and the next day URI made a final indemnification payment to Terex of approximately $8.7 million. URI improperly recorded the $8.7 million as expenses unrelated to the sale-leaseback transaction.

### Terex II

In December 2001, as the fiscal year for both URI and Terex was coming to an end, Apuzzo participated in a second fraudulent

three-party sale-leaseback transaction, which was engineered to enable URI to meet its fourth quarter and year-end earnings guidance and to permit Terex to make a large year-end sale of new equipment to URI. Terex II was structured similarly to the Terex I transaction: (1) URI sold used equipment to GECC and leased it back for a short period; (2) Terex agreed to remarket the equipment and provide GECC with the same residual value guarantee it had previously made; and (3) URI agreed to purchase new equipment from Terex and to indemnify Terex for the losses it was expected to incur under the residual value guarantee.

As before, the agreements were structured to conceal the interlocking nature of the three-party transactions. In particular, the documents failed to disclose the effective <u>quid</u> <u>pro</u> <u>quo</u> between Terex's agreement with GECC to remarket the equipment and provide a residual value guarantee, and URI's agreement to both purchase new equipment from Terex and indemnify Terex for its losses under the residual value guarantee.

Just as with Terex I, in which the transaction documents were edited to remove references to the interlocking nature of the agreements, Apuzzo signed the Terex II remarketing agreement knowing that it made no reference to URI's commitment to indemnify Terex. Moreover, Apuzzo understood that URI continued to want the agreements to be kept separate. On December 19, 2001, Apuzzo received an email from the Terex sales manager who was engaged in

the negotiations with URI, which specifically noted that the URI
sales manager wanted the transactions "on two separate documents."
Compl. ¶ 42.  Consistent with this goal, URI's commitment to
indemnify Terex was not disclosed in the "bill and hold" letter,
dated December 21, 2001, URI sent in connection with its agreement
to purchase new equipment from Terex.

Prior to entering into the agreements in connection with Terex
II, Terex had determined that the valuation of the used equipment
being sold to GECC by URI was above the fair market value and would
likely cause Terex losses in excess of $4 million as a result of
Terex's promise that GECC would receive pursuant to the remarketing
agreement at least 96% of the purchase price GECC was paying to
URI. Before agreeing to provide GECC with the residual value
guarantee, Terex insisted that URI agree to indemnify Terex for
this anticipated loss.  Apuzzo received internal email
communications disclosing the materially lower appraisals of the
used equipment being sold to GECC and the imposition of a $4
million "premium" on the sale of $24 million of new equipment being
sold by Terex to URI covering the corresponding shortfall Terex
expected as a result of the residual value guarantee.

On December 27, 2001, the day before the sale-leaseback and
remarketing agreements were executed, Apuzzo received an email from
a Terex employee notifying GECC and others that the equipment list
submitted by URI to GECC, which listed the equipment for which

-14-

Terex was providing the residual value guarantee, contained "correct values." Compl. ¶ 44. Notwithstanding this communication to GECC, Apuzzo signed the remarketing agreement between Terex and GECC knowing that it did not disclose the materially lower appraisals that Terex had obtained, the likelihood of substantial losses to Terex pursuant to the residual value guarantee, and URI's commitment to indemnify Terex for those losses.

Apuzzo received internal Terex communications discussing the payment of a $4 million "premium" on the purchase of $24 million of new equipment. As in the Terex I transaction, Terex issued inflated invoices showing the aggregate purchase price of the new equipment to be $28 million, without disclosure of the purported $4 million "premium". As before, the disguising of the indemnification payment was done with Apuzzo's knowledge.

While Terex sales managers negotiated directly with their URI counterparts concerning many of the details of the transaction, Apuzzo was involved throughout the process, in discussions with Nolan, monitoring email communications, and maintaining control over the final terms of the agreements. On December 29, 2001, the day after the agreements were executed, in an email to one of Terex's senior officers, Apuzzo reported on the successful conclusion of the negotiations, noting in particular that Terex had generated cash from the sale to URI that would be credited to cash at year end. As with the Terex I transaction, Apuzzo improperly

recorded revenue from the sale of the new equipment to URI to improve Terex's reported year-end financial results.

### $3.5 Million Advance Payment

During the same period in which the Terex I transaction was negotiated, URI was simultaneously negotiating with GECC the purchase of an unrelated equipment rental company in which GECC had an ownership interest. In connection with that negotiation, URI made an advance payment to GECC of a $3.5 million fee, which was contingent upon URI's successful completion of the acquisition. Nolan and others and GECC agreed that if URI did not successfully complete the acquisition, GECC would pay the $3.5 million to Terex instead of returning it to URI. Although Terex had no involvement with the proposed acquisition being negotiated between URI and GECC, Apuzzo agreed to include in the Terex I remarketing agreement a provision requiring that the contingent fee URI was paying to GECC be forwarded to Terex if the URI acquisition was not completed.

Having signed the Terex I remarketing agreement in December 2000 requiring the $3.5 million to be forwarded to Terex, in June 2001 Apuzzo agreed to amend the agreement to reduce the amount that GECC was to forward to Terex by approximately $1.25 million. The amendment served no purpose other than to allow URI and GECC to conceal the $1.25 million in fees URI was being charged by GECC in connection with new sale-leaseback transactions in which Terex had

no financial or other involvement.  In December 2001, Apuzzo agreed
to again amend the Terex I remarketing agreement, lowering the
amount that GECC was to forward to Terex by an additional $277,000.
This amendment served no purpose other than to allow URI and GECC
to use the $277,000 to cover fees URI was being charged in
connection with the Terex II transaction.

## II.  <u>LEGAL STANDARD</u>

When deciding a motion to dismiss under Rule 12(b)(6), the
court must accept as true all factual allegations in the complaint
and must draw inferences in a light most favorable to the
plaintiff.  <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974).  Although
a complaint "does not need detailed factual allegations, a
plaintiff's obligation to provide the 'grounds' of his
'entitle[ment] to relief' requires more than labels and
conclusions, and a formulaic recitation of the elements of a cause
of action will not do."  <u>Bell Atlantic Corporation v. Twombly</u>, 550
U.S. 544, 555 (2007).  "Factual allegations must be enough to raise
a right to relief above the speculative level, on the assumption
that all allegations in the complaint are true (even if doubtful in
fact)."  <u>Id</u>. (citations omitted).  The plaintiff must plead "only
enough facts to state a claim to relief that is plausible on its
face."  <u>Id</u>. at 1974.  "The function of a motion to dismiss is
'merely to assess the legal feasibility of the complaint, not to
assay the weight of the evidence which might be offered in support

thereof.'" <u>Mytych v. May Dept. Store Co.</u>, 34 F. Supp. 2d 130, 131
(D. Conn. 1999), quoting <u>Ryder Energy Distribution v. Merrill Lynch
Commodities, Inc.</u>, 748 F.2d 774, 779 (2d Cir. 1984). "The issue on
a motion to dismiss is not whether the plaintiff will prevail, but
whether the plaintiff is entitled to offer evidence to support his
claims." <u>United States v. Yale New Haven Hosp.</u>, 727 F. Supp. 784,
786 (D. Conn. 1990) (citing <u>Scheuer</u>, 416 U.S. at 232).

While Rule 8(a) sets forth minimum pleading requirements,
securities fraud claims, including claims for aiding and abetting
fraud, are subject to Rule 9(b)'s heightened pleading requirement
that the circumstances constituting the fraud be stated with
particularity. <u>See</u> <u>Shields v. Citytrust Bancorp, Inc.</u>, 25 F.3d
1124, 1128 (2d Cir. 1994). But Rule 9(b)'s particularity
requirement does not apply to allegations of mental condition such
as intent or knowledge, which only need to be pled generally. To
satisfy this requirement, the complaint must allege an adequate
factual foundation that create a strong inference of scienter.
<u>Stern v. Leucadia Nat. Corp.</u>, 844 F.2d 997, 1004 (2d Cir. 1980);
<u>see</u> <u>also</u> <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S.
308, 320-22 (2007)(noting that the court must take all of the
alleged facts collectively, and not scrutinize individual
allegations in isolation, to determine whether they give rise to a
strong inference of scienter).

**III. <u>DISCUSSION</u>**

The SEC may bring a civil action against "any person that knowingly provides substantial assistance to another person in violation of a provision of [the securities laws], or of any rule or regulation issued" thereunder.  15 U.S.C. § 78t(e).  Thus, "[t]o state a claim that defendants aided and abetted violations of the Exchange Act, the SEC must allege (1) a primary violation of the Exchange Act, (2) actual knowledge of the violation by the aider and abettor, and (3) that the aider and abettor substantially assisted the primary violation.  <u>See</u> <u>SEC v. Cedric Kushner Promotions</u>, 417 F. Supp. 2d at 334."  <u>SEC v. Espuelas</u>, 579 F. Supp. 2d 461, 483-84 (S.D.N.Y. 2008).

Apuzzo maintains that the complaint should be dismissed because it fails to adequately allege the second and third elements, i.e., actual knowledge of the violation and substantial assistance.  In addition, Apuzzo contends that the majority of the SEC's claims are time-barred by the five-year statute of limitations and that the complaint fails to satisfy the requirement of Fed. R. Civ. P. 9(b) that fraud be pled with particularity.  Because the court concludes that while the SEC has adequately alleged actual knowledge of the violation it has not adequately alleged substantial assistance, the court does not reach Apuzzo's arguments with respect to the statute of limitations and pleading fraud with particularity.

**A.    Actual Knowledge of the Violation**

The SEC contends that recklessness or extreme recklessness is sufficient for aiding and abetting liability, and in support of that contention the SEC relies on cases such as <u>Howard v. SEC</u>, 376 F.3d 1136, 1142-43 (D.C. Cir. 2004), and <u>Geman v. SEC</u>, 334 F.3d 1183, 1195 (10th Cir. 2003).  However, the court finds persuasive the analysis in <u>SEC v. KPMG, LLP</u>, 412 F. Supp. 2d 349 (S.D.N.Y. 2006):

> Exchange Act Section 20(e) imposes liability in an SEC enforcement action on "any person that knowingly provides substantial assistance to another person in violation of a provision of this title, or of any rule or regulation issued under this title." 15 U.S.C. § 78t(e). The SEC argues that Section 20(e) encompasses recklessness in addition to actual knowledge. This contention must be rejected.

> Elsewhere in the Exchange Act, in a provision also passed as part of the PSLRA, "knowingly" is explicitly defined as actual knowledge, but that definition is limited to its subsection. <u>See</u> 15 U.S.C. § 78u-4(f)(1)(A). Nevertheless, the fact that the "knowingly" was defined as actual knowledge in the very same bill that contained Section 20(e) weighs in favor of the defendants' contention that the provision does not encompass recklessness. "[I]dentical words used in different parts of the same act are intended to have the same meaning." <u>Gustafson v. Alloyd Co.</u>, 513 U.S. 561, 570, 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995) (citation omitted). In addition, the Senate considered and rejected an amendment to the proposed Section 20(e) that would have added recklessness to the standard. . . .

> . . .

> In support of its contention that Section 20(e) encompasses recklessness, the SEC notes that courts reference pre-<u>Central Bank</u> case law on aiding and abetting to flesh out the requirements of the provision, citing <u>SEC v. Lybrand</u>, 200 F. Supp. 2d. 384, 399 (S.D.N.Y. 2002). The contention that Section 20(e) was intended to codify existing law is

a tenuous one, however. The law prior to <u>Central Bank</u>, and
thus prior to the PSLRA, was not uniform on the issue of
what constituted the requisite scienter for aiding and
abetting liability, and the Supreme Court had in fact
granted certiorari on the issue in <u>Central Bank</u>, although
it never reached it because of its outright rejection of
private aiding and abetting claims under Section 10(b) in
that case. <u>Dinsmore v. Squadron, Ellenoff, Plesent,
Sheinfeld & Sorkin</u>, 135 F.3d 837, 844 (2d Cir. 1998)
(citing 61 U.S.L.W. 3813-14, 508 U.S. 959, 113 S.Ct. 2927,
124 L. Ed. 2d 678 (U.S. June 8, 1993)). Congress was aware
of this lack of uniformity when it passed Section 20(e).

<u>Id</u>. at 382-83. <u>See</u> <u>also</u> <u>SEC v. Stanard</u>, No. 06 Civ. 7736 (GEL),
2009 WL 196023, *31 (S.D.N.Y. Jan. 27, 2009)("Courts have been
clear in requiring a showing of 'actual knowledge of the violation
by the aider and abettor.'"); <u>SEC v. Espuelas</u>, 579 F. Supp. 2d 461,
484 (S.D.N.Y. 2008)("[A]ctual knowledge is the standard for aiding
and abetting . . ."); <u>SEC v. Cedric Kushner Promotions, Inc.</u>, 417
F. Supp. 2d 326, 335 (S.D.N.Y. 2006)("This court agrees that
knowing misconduct must now be shown."). <u>But</u> <u>see</u> <u>SEC v. PIMCO
Advisors Fund Management LLC</u>, 341 F. Supp. 2d 454, 468 (S.D.N.Y.
2004)("Recklessness is sufficient scienter to satisfy the knowledge
element of aider and abettor liability in this case, where Corba,
as an executive of the entity that managed investors' funds, owed a
fiduciary duty to those who were defrauded by the misleading
disclosures. <u>Armstrong</u>, 699 F.2d at 91.").

Apuzzo argues that the SEC has failed to adequately allege
facts that could show he had actual knowledge of the primary
violation of the securities laws by URI. "[A] defendant's general
awareness of its overall role in the primary violator's illegal

scheme is sufficient knowledge for aiding and abetting liability."
K & S Partnership v. Continental Bank, N.A., 952 F.2d 971, 977 (8th
Cir. 1991)(citing FDIC v. First Interstate Bank, 885 F.2d 423, 429-
31 (8th Cir. 1989)).  "Such knowledge may be proved by and inferred
from circumstantial evidence, including facts available to the
defendant's employees. . . . Woods v. Barnett Bank of Fort
Lauderdale, 765 F.2d 1004, 1009 (11th Cir. 1985). Knowledge may be
shown by circumstantial evidence . . ." Id. (internal quotation
marks omitted).  However, "[a] plaintiff's case against an aider,
abetter, or conspirator may not rest on a bare inference that the
defendant must have had knowledge of the facts." Id. (quoting
Schlifke v. SeaFirst Corp., 866 F.2d 935, 948 (7th Cir.
1989))(internal quotation marks omitted).

    The complaint alleges that URI and Nolan committed the primary
violation by improving URI's 2000 and 2001 financial results by
inflating the profits generated from the sales of the used
equipment to GECC and recognizing prematurely revenue from those
sales of equipment to GECC, and that concealing the true structure
of Terex I and Terex II from URI's auditor was part of the
fraudulent scheme.  URI was able to inflate profits from the sales
of the used equipment by selling it to GECC at prices in excess of
its fair market value.  URI was able to recognize revenue
prematurely by concealing from its auditor the fact that URI
continued to possess the risks and rewards of ownership and the

fact that the sales price was not fixed and determinable because of outstanding commitments under the three-party interlocking agreements. The interlocking nature of the agreements between URI and GECC, GECC and Terex, and Terex and URI was disguised through the use of separate agreements that concealed the connection between the transactions, and the indemnification payments by URI to Terex were concealed through the use of inflated invoices that disguised the indemnification payments as undisclosed premiums on URI's purchase of new equipment from Terex.

The complaint contains factual allegations which, taken as true, support a conclusion that Apuzzo knew URI was inflating the profits generated by URI's sales of the used equipment to GECC and also knew the material details as to the true structure of each of Terex I and Terex II; Apuzzo knew that the transactions were being documented in a manner that concealed the interlocking nature of the three-party agreements and thus failed to disclose the true structure of the transactions; Apuzzo knew that the results from the transactions would be inaccurately reflected in URI's financial statements if the true structure of the transactions was not known to URI's auditor; and Apuzzo knew that URI's auditor was being misled.

The factual allegations in the complaint support a conclusion that Apuzzo knew URI was inflating the profits generated by URI's sales of the used equipment to GECC and also knew the material

details as to the true structure of each transaction.  In
connection with Terex I, Apuzzo obtained an internal Terex
appraisal of the used equipment URI was selling to GECC and knew
that URI had assigned a valuation to the used equipment sold to
GECC in excess of its fair market value.  On behalf of Terex,
Apuzzo signed both the remarketing agreement and the backup
remarketing agreement, the combined effect of which was to make URI
ultimately financially responsible for the residual value guarantee
to GECC, so he knew that URI continued to possess the risks and
rewards of ownership and that the sales price was not fixed and
determinable.  In connection with Terex II, Apuzzo had comparable
knowledge that the valuation of the used equipment being sold to
GECC by URI was in excess of $4 million above the fair market
value.  Apuzzo signed the remarketing agreement between Terex and
GECC in connection with Terex II, and before doing so he insisted
that URI agree to indemnify Terex for its anticipated loss pursuant
to the remarketing agreement.  Apuzzo was involved throughout the
process in Terex II and maintained control over the final terms of
the agreements.

Apuzzo knew that the transactions were being documented in a
manner that concealed the interlocking nature of the three-party
agreements and thus failed to disclose the true structure of
transactions.  In connection with Terex I, Apuzzo sent Nolan an
initial draft of the proposed backup remarketing agreement that

explicitly described Terex's residual value guarantee to GECC and recited URI's agreement, pursuant to the backup remarketing agreement, to remarket equipment as well as indemnify Terex for any losses it incurred as a result of the residual value guarantee. Apuzzo signed the backup remarketing agreement, knowing that URI's revised draft deleted all explicit references that would reflect the connection between the backup remarketing agreement, the sale-leaseback agreement and the remarketing agreement, even though it was in Terex's interest to make it clear that URI was responsible for indemnifying Terex for losses it incurred as a result of the residual value guarantee given pursuant to the remarketing agreement. With respect to the indemnification payments, Apuzzo agreed with Nolan that the payments would be made as undisclosed "premiums" paid in connection with URI's purchase of new equipment from Terex. Apuzzo approved the issuance by Terex of invoices that reflected an aggregate purchase price of $25 million for new equipment that Terex valued at $20 million.

In connection with Terex II, the transaction documents were also edited to remove references to the interlocking nature of the three-party agreements, and Apuzzo received an email from a Terex sales manager that specifically noted URI's desire for separate documents. As in Terex I, the indemnification payment was disguised as a premium on the purchase of new equipment, and Terex issued inflated invoices that did not disclose that premium; the

disguising of the indemnification payment was done with Apuzzo's knowledge.

The complaint contains factual allegations that support a conclusion that Apuzzo knew that the results of the transactions would be inaccurately reflected in URI's financial statements if the true structure of the transactions was not known to URI's auditor. Apuzzo was a licensed CPA with an MBA in public accounting, had previously worked in a public accounting firm, and was the chief financial officer of Terex during the relevant time period. His accounting knowledge is relevant. See Espuelas, 579 F. Supp. 2d at 483-84("The Complaint contains no allegations that someone with accounting knowledge communicated to her that the transactions were being accounted for incorrectly, and like Scolnik, the Complaint lacks any allegations that Kampfner possessed any accounting expertise herself."); SEC v. Sandifur, No. C05-1631C, 2006 WL 538210, *7 (W.D. Wash. March 2, 2006)("[T]here are no allegations that Defendant Ness had been told that the transaction would violate GAAP. Instead, the complaint relies on allegations regarding Defendant Ness's training and position in the company . . . to support its allegation that he 'knew or was reckless in not knowing' that it was improper for Metropolitan to recognize revenue on the Neighborhood I transaction . . . and that it was improper to recognize the gain in Metropolitan's 10-Q for that quarter . . ."). Apuzzo was aware of facts about how the

transactions were actually structured sufficient to inform a person
knowledgeable about accounting that the transactions did not
qualify as minor sale-leasebacks.

The SEC alleges that Apuzzo's motivation for entering into the
transactions was to boost Terex's year-end financial results, and
Apuzzo's knowing conduct with respect to how the results of the
transactions were reflected in Terex's financial statements also
supports such a conclusion with respect to his knowledge concerning
URI's financial statements. In connection with Terex I, although
the invoices issued to URI reflect an aggregate purchase price of
$25 million for new equipment that Terex internally valued at $20
million, with Apuzzo's knowledge and approval, the $5 million
overpayment was recorded as a reserve to be used to cover Terex's
anticipated losses under its residual value guarantee. URI's
purchase of the $20 million of new equipment did not comply with
"bill and hold" accounting guidance. However, in a pattern similar
to the steps taken by URI to disguise the interlocking nature of
the sale-leaseback agreement, the remarketing agreement and the
backup remarketing agreement, no purchase agreement between Terex
and URI was prepared, URI did not issue any purchase orders, and
URI's right of return of the new equipment it was purchasing was
memorialized in the Separate Agreement, which was signed by Apuzzo
on behalf of Terex. Apuzzo improperly recorded the $20 million
portion of the payment as revenue for the fiscal year ending

December 31, 2000.  Similarly, in the Terex II transaction, Apuzzo improperly recorded revenue from the sale of new equipment to URI to improve Terex's recorded year-end results.

Finally, the factual allegations in the complaint support a conclusion that Apuzzo knew that URI's auditor was being misled.  In connection with Terex I, Apuzzo obtained an internal appraisal of the used equipment URI was selling to GECC and thus knew that URI was selling the equipment to GECC at a price in excess of its fair market value.  Apuzzo was asked to provide a valuation letter to URI's auditor representing that URI had assigned fair market valuations to the used equipment sold to GECC, but instead, he offered to provide a different letter.

### B.    Substantial Assistance

As discussed above, in addition to alleging a primary violation of the Exchange Act and actual knowledge by the aider and abettor of the violation, the SEC must allege that the aider and abettor substantially assisted the primary violation.  "In alleging the requisite 'substantial assistance' by the aider and abettor, the complaint must allege that the acts of the aider and abettor proximately caused the harm to the corporation on which the primary liability is predicated."  Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 62 (2d Cir. 1985).  "Allegations of a 'but for' causal relationship are insufficient.  Edwards & Hanly, 602 F.2d at 484."  Id. at 63.  "[M]ere awareness and approval of the

primary violation is insufficient to make out a claim for substantial assistance." SEC v. Power, 525 F. Supp. 2d 415, 422 (S.D.N.Y. 2007)(quoting SEC v. Treadway, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006)). "A defendant provides substantial assistance only if [he] affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed." SEC v. Espuelas, 698 F. Supp. 2d 415, 433 (S.D.N.Y. 2010)(internal quotation marks omitted).

SEC v. Patel, Civil No. 07-cv-39-SM, 2008 WL 782483 (D.N.H. March 24, 2008), contains a helpful discussion of examples of allegations that adequately allege substantial assistance contrasted to ones that fail to do so. There, in concluding that the SEC had failed to adequately allege conduct linking defendant Collins to the primary violation, the court compared the allegations with respect to Collins to the allegations against the alleged aiders and abettors in SEC v. Druffner, 353 F. Supp. 2d 141 (D. Mass. 2005)[2] and SEC v. Power, 525 F. Supp. 2d 415 (S.D.N.Y. 2007):

> In Druffner, the substantial assistance alleged in the complaint consisted of the defendant's "1) approving additional account numbers and FA numbers, 2) authorizing

---

[2]In Druffner, defendant Shannon was the manager of the branch at which the fraudulent scheme was carried out. "The defendant brokers allegedly used numerous broker identification numbers (called 'FA numbers,' shorthand for 'financial advisor numbers') and opened nearly 200 customer accounts under fictitious names." SEC v. Druffner, 353 F. Supp. 2d 141, 146 (D. Mass. 2005).

the processing of unfinished transactions at the New York office and 3) <u>failing to stop</u> the brokers' fraudulent activity after he received numerous block letters complaining of such activity when he had a duty as Branch Manager to do so." 353 F. Supp. 2d at 151 (emphasis added). According to the court, "[s]uch allegations involve[d] specific instances of <u>affirmative conduct</u> that support[ed] the charge that [the defendant] aided and abetted the brokers' securities law violations." <u>Id.</u> (emphasis added). And in <u>Power</u>, an enforcement action against a former Vice President of Tyco International Ltd. ("Tyco"), the court denied the defendant's motion to dismiss based upon the SEC's factual allegations that the defendant: (1) <u>created</u> a form of transaction that was "designed ... to have a specific and false accounting effect," 525 F. Supp. 2d at 418; (2) <u>was responsible for</u> fraudulent acquisition accounting that reduced Tyco's assets and increased its liabilities . . .; (3) <u>proposed</u> an asset write-off that was implemented with the effect of inflating "Tyco's reported income improperly by reducing its depreciation expenses," <u>id.</u>; (4) <u>oversaw</u> various fraudulent accounting decisions in a 1999 acquisition . . .; and (5) "<u>directed</u> the entry of multiple improper pre-merger adjustments," <u>id.</u> (emphasis added).

Here, by contrast, the complaint alleges that: (1) the Ariel letter agreement <u>was circulated</u> to Collins and others . . .; (2) Collins and others <u>received</u> e-mails from Kay and others about the Ariel agreement . . .; (3) Collins and others <u>decided</u> not to provide the Ariel letter agreement to Enterasys's outside auditor . . .; (4) Collins <u>was advised</u> by Hurley of Hurley's intent to submit a falsified version of the Ariel agreement to Enterasys's outside auditor . . .; (5) Collins and others <u>agreed to a plan</u>, never executed, to conceal SG Cowen's return of products it had purchased from Aprisma . . .; (6) Collins <u>knew</u> that it was improper to recognize revenue from the Accton transaction . . .; (7) Collins <u>knew</u>, and <u>failed to disclose</u>-to whom, the complaint does not say-that Enterasys was responsible for reselling the products it sold to JBS, making it improper to recognize revenue from that transaction . . .; and (8) Collins <u>knew</u> of the falsity of the summary of investment-related revenue that Hurley prepared at Gagalis' direction and submitted to the outside auditor . . . . Those are the only factual allegations in the complaint that refer to Collins. Few, if any, rise to the level of "affirmative conduct," and none of those that arguably do rise to that level specifically link Collins to the primary

violation, which is the false reporting of revenue in
Enterasys's SEC filings.

The closest the SEC comes to alleging affirmative conduct
is its claim that Collins, together with Kay and Gagalis,
"decided" not to provide the original Ariel letter
agreement to the outside auditor. But, even assuming that
participating in a group decision to withhold the Ariel
agreement is the equivalent of actually withholding it, the
SEC's allegation falls short of what is needed to support
a claim that Collins substantially assisted in the
preparation of a fraudulent SEC filing, given the
complaint's failure to specify either the Enterasys
official(s) who were responsible for providing
documentation to the auditor or the reporting relationships
among Collins, Kay, and Gagalis, or what role Collins
played in (or what influence, authority, or responsibility
he had with regard to) "deciding" as part of the group.

Patel, 2008 WL 782483 *11-12.

Also, in SEC v. Pimco Advisors Fund Management LLC, 341 F.

Supp. 2d 454 (S.D.N.Y. 2004), the court concluded that "Corba's

alleged facilitation of the undisclosed Canary arrangement and the

market timing activities conducted thereunder, in combination with

his failure to correct his own funds' market timing-related

disclosures when they were rendered materially misleading, indicate

that Corba provided substantial assistance in the primary violation

. . ." Id. at 468.  The conduct that constituted "facilitation" by

Corba of the undisclosed arrangement was Corba and a co-defendant

entering into an arrangement with Canary Capital Partners LLC on

behalf of several PIMCO entities; Corba was at the time the manager

of two of the PIMCO mutual funds and the chief executive officer of

a corporate entity within the PIMCO family of mutual funds, and

thus he owed a fiduciary duty to those who were defrauded by

misleading disclosures with respect to the funds.

Here, the complaint contains factual allegations which taken as true support a conclusion that there was a "but for" causal relationship between Apuzzo's conduct and the primary violation, but do not support a conclusion that Apuzzo's conduct proximately caused the primary violation.  The complaint alleges that URI and Nolan committed the primary violation by improving URI's 2000 and 2001 financial results by inflating the profits generated by sales of used equipment to GECC and recognizing prematurely revenue from those sales of equipment to GECC, and as part of the fraudulent scheme concealed the true structure of Terex I and Terex II from URI's auditor.  Absent from the complaint here are allegations tending to support a conclusion that Apuzzo caused the primary violation by creating the structure for Terex I and Terex II, like the defendant in Power.  Rather the complaint alleges that Nolan and others purported to structure the transactions as minor sale-leasebacks.  Also absent from the complaint are allegations tending to support a conclusion that Apuzzo was the person responsible for bringing the respective parties to the three-party agreements to the transactions.  Rather, the complaint alleges that Nolan contacted GECC and then Nolan and others initiated discussions with Terex.  Nor does the complaint contain allegations tending to support a conclusion that Apuzzo was the person who caused the modifications to the transaction documents so as to conceal the

interlocking nature of the three-party agreements.  Rather, the complaint alleges, with respect to Terex I, that when Apuzzo sent Nolan an initial draft of the backup remarketing agreement Apuzzo's draft explicitly described Terex's residual value guarantee to GECC and recited URI's agreement to indemnify Terex for losses that Terex incurred as a result of the residual value guarantee, but Nolan and others sent Apuzzo a revised draft that concealed the true nature of Terex I.  Terex II was then structured similarly to Terex I.

Unlike the defendant in Power, Apuzzo was not responsible for the accounting decisions at URI, the entity whose materially misleading financial statements were the vehicle for the primary violation.  Nolan, not Apuzzo, was URI's chief financial officer; the accounting decisions for which Apuzzo was responsible were those affecting the financial statements of Terex.  Also, the complaint alleges that Nolan, not Apuzzo, forwarded the inflated invoices for the new equipment purchased in connection with Terex I to URI's accounting department so the incorrect prices could be entered in URI's book and records.

Nor does the complaint contain factual allegations tending to support a conclusion that Apuzzo concealed information from URI's auditor.  While the complaint alleges that Apuzzo was asked to provide a valuation letter to URI's auditor, it alleges that instead he offered to provide an appraisal letter that would have

-33-

been misleading.  However, the complaint does not allege that
Apuzzo actually provided an appraisal letter to anyone.  Nor does
the complaint allege who asked Apuzzo to provide the valuation
letter to URI's auditor or to whom Apuzzo offered to provide an
appraisal letter.

Unlike the defendant in PIMCO, Apuzzo did not enter into an
arrangement on behalf of the entity whose financial statements the
SEC alleges were rendered materially misleading as a result of the
fraudulent scheme.  Also, unlike the defendant in Druffner, Apuzzo
did not give Nolan or others within URI authorization that was
necessary in order for them to engage in conduct that carried
forward the fraudulent scheme.  Rather the factual allegations in
the complaint support only the conclusion that Apuzzo participated
in Terex I and Terex II, the transactions about which URI's auditor
was misled, knowing of the primary violation.  As the chief
financial officer of Terex, not URI, Apuzzo had no duty to disclose
the true structure of the transactions to URI's auditor, and the
complaint does not contain factual allegations as to circumstances
that gave rise to such a duty on his part.  Apuzzo's "mere
awareness and approval of the primary violation" does not establish
that he proximately caused the harm to URI and thus substantially
assisted the primary violation.  Power, 525 F. Supp. 3d at 422.

Accordingly, the SEC has failed to allege that Apuzzo aided
and abetted the primary violation of the securities laws by Nolan

and others.

**IV.   <u>CONCLUSION</u>**

For the reason's set forth above, the defendant's Motion to Dismiss (Doc. No. 40) is hereby GRANTED.

It is so ordered.

Dated this 20th day of December, 2010 at Hartford, Connecticut.

_____
/s/AWT
Alvin W. Thompson
United States District Judge
