**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
----------------------------------x
                                   :
SECURITIES AND EXCHANGE            :
COMMISSION,                        :
                                   :
            Plaintiff,             :
                                   :   Civil No. 3:07CV1910(AWT)
v.                                 :
                                   :
JOSEPH F. APUZZO                   :
                                   :
            Defendant.             :
                                   :
----------------------------------x
```

<u>**RULING ON MOTION FOR PARTIAL SUMMARY JUDGMENT**</u>

The Securities and Exchange Commission (the "SEC") brings this action pursuant to §§ 21(d) and 21(e) of the Exchange Act, 15 U.S.C. § § 78u(d) and (e), against Joseph F. Apuzzo ("Apuzzo"), the former chief financial officer of Terex Corporation ("Terex"), alleging that he aided and abetted a fraudulent accounting scheme involving two sale-leaseback transactions and carried out between 2000 and 2002 by United Rentals, Inc. ("URI") and its former chief financial officer Michael J. Nolan ("Nolan") and others.  Apuzzo has moved for partial summary judgment with respect to the equitable remedies sought by the SEC.  For the reasons set forth below, the motion is being denied.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

For the purposes of this motion, Apuzzo "asks the Court to accept as true all of the SEC's allegations against him, specifically that he signed the 2000 and 2001 remarketing agreements and the 2002 close-out agreement knowing that URI intended to book or had booked the two transactions improperly." (Reply Mem. (Doc. No. 89) at 1).

Terex manufactures equipment primarily for the construction, infrastructure, and surface to mining industries. Apuzzo was the chief financial officer of Terex from October 1998 to September 2002, when he left the company to become president of Terex Financial Services, a division of Terex.  He was president of Terex Financial Services until August 2005. Apuzzo was a licensed CPA during part of the time that he worked at Terex, has an MBA in Public Accounting, and had previously worked at a public accounting firm.

URI is one of the largest equipment-rental companies in the world.  During the relevant time period, URI regularly purchased equipment from Terex and rented it to other companies.  Nolan was URI's chief financial officer from its inception in September 1997 until December 2002.

**Terex I**

In the later part of 2000, Nolan contacted General Electric Capital Corporation ("GECC"), the financing arm of General

Electric, about a minor sale-leaseback transaction.  Unlike a
traditional sale-leaseback which would require URI to amortize
profit, the minor sale lease-back would allow URI to record an
immediate gain.  GECC advised Nolan that it would not enter into
a sale-leaseback transaction with URI unless a third party
agreed to remarket the equipment at the end of the lease period
and to provide a guarantee with respect to the residual value of
the equipment.  The third party would also be required to
purchase, at the guaranteed residual values, any equipment that
remained unsold at the end of the remarketing agreement.
Because GECC had an existing relationship with Terex, GECC
suggested that Terex act as the guarantor.

   Nolan and others initiated discussions with Terex, which
was one of URI's vendors, and Apuzzo was asked to oversee the
negotiations on Terex's behalf.  Nolan explained the terms of
the proposed transaction to Apuzzo, who expressed a willingness
to participate as long as URI (1) agreed to indemnify Terex with
respect to any losses Terex might incur as a result of providing
a residual value guarantee to GECC, and (2) made additional new
equipment purchases from Terex in the current fiscal year in
order to boost Terex's year-end financial results.

   On December 29, 2000, URI and GECC entered into a Master
Lease Agreement pursuant to which URI sold used Terex equipment
to GECC for $25 million, and GECC leased the equipment back to

URI for eight months.  The same day, GECC entered into a
Remarketing Agreement pursuant to which Terex agreed to remarket
the used equipment at the end of the lease period and to pay for
any shortfall between the residual value guarantee (96% of
GECC's purchase price) and the proceeds that were generated by
the resale of the equipment.  URI and Terex also entered into a
an agreement under which URI agreed to purchase from Terex
approximately $20 million of new equipment before the end of the
2000 calendar year, and to pay Terex approximately $5 million
immediately to cover Terex's anticipated losses on account of
the residual value guarantee.  In accordance with the agreement
between Apuzzo, Nolan and others, URI and Terex also executed a
"backup" remarketing agreement, which Apuzzo also signed on
behalf of Terex, under which URI effectively assumed Terex's
remarketing obligations and residual value guarantee to GECC and
agreed to cover any losses to Terex exceeding the $5 million
advance payment by means of guaranteed future purchases.

     Apuzzo sent Nolan an initial draft of the proposed backup
remarketing agreement.  That initial draft explicitly described
Terex's residual value guarantee to GECC.  It also recited URI's
agreement to remarket the equipment as well as indemnify Terex
for any losses it incurred as a result of the residual value
guarantee.  However, in response to Apuzzo's initial draft of
the backup remarketing agreement, Nolan and others sent Apuzzo a

revised draft that deleted all explicit references to GECC and to URI's agreement to remarket the equipment.  Instead, URI's revised draft referred to URI's obligation to remarket equipment "which is typically in United Rentals rental fleet and is then owned by a leasing company which is not less than investment grade, and is required to be remarketed by Terex from such leasing company for a period commencing in August, 2001." (Compl. ¶ 21).  Nowhere in URI's revised draft was there any language identifying the leasing company or mentioning the fact that the equipment to be remarketed was equipment URI had sold to GECC.  Instead of referring to the residual value guarantee from Terex to GECC, URI's revised draft referred to URI's guarantee to pay Terex "the total cost incurred or that would be incurred by Terex to purchase such equipment. . . ."  Id.

Before committing Terex to the residual value guarantee, Apuzzo obtained an internal appraisal of the used equipment URI was selling to GECC.  Based on that appraisal, Apuzzo knew that Terex's agreement to guarantee GECC at least 96% of the valuation URI had placed on the equipment would likely cause Terex to incur substantial losses when the equipment was resold.  Consequently, Apuzzo insisted that URI agree to indemnify Terex against any such loss.  When Apuzzo signed the remarketing agreement, he understood that, although it would likely result in millions of dollars in losses to Terex for which Terex

expected to be indemnified by URI, URI's commitment to indemnify Terex for such losses was set forth in a separate document that failed to make any explicit reference to the remarketing agreement, the residual value guarantee, or even the transaction to which it related.

URI agreed to purchase $20 million of new equipment from Terex and to pay Terex before year-end 2000 if the equipment could be delivered in 2001 rather than immediately.  Apuzzo agreed to this and, in addition, provided assurances to Nolan and others that URI could substitute different equipment if necessary, or otherwise return equipment for full credit if URI subsequently determined that it did not need the equipment. Because Terex was unable to deliver the new equipment to URI before December 31, 2000, Terex could immediately recognize the revenue from the sale to URI if the transaction complied with "bill and hold" accounting guidance.  Among other things, Apuzzo's agreement to allow URI to substitute or return equipment did not comply with "bill and hold" requirements.

URI made two lump-sum indemnification payments to Terex in connection with Terex I.  An initial payment of $5 million was made simultaneously with the execution of the documents for the transaction.  The second payment was made on January 2, 2003, after a final reconciliation of the numbers had been performed by GECC, Terex and URI.  Apuzzo and Nolan agreed that URI's

indemnification payments to Terex would be made as undisclosed "premiums" paid in connection with URI's purchase of new equipment from Terex.

In accordance with the agreement between Apuzzo, Nolan and others, the initial $5 million indemnification payment was made in connection with URI's agreement to purchase approximately $20 million of new equipment from Terex before the end of the 2000 calendar year.  On December 29, 2000, with Apuzzo's knowledge and approval, Terex issued two invoices that reflected an aggregate price of $25 million for new equipment that Terex internally valued at $20 million.  Notwithstanding the prices shown on the invoices, with Apuzzo's knowledge and approval, Terex recorded only $20 million of the $25 million as revenue for 2000 and recorded the $5 million overpayment as a reserve to be used to cover Terex's anticipated losses under its residual value guarantee.  Contemporaneously, Nolan forwarded the inflated invoices to URI's accounting department, knowing that the accounting department would enter the incorrect prices in URI's books and records.

During 2001 and 2002, as an industry recession continued, URI and Terex were unable to resell the equipment at or near the residual value that had been guaranteed to GECC.  In fact, losses exceeded the initial estimated $5 million shortfall. Towards the end of 2002, following extensions of the remarketing

period provided for in the remarketing agreement, GECC prepared a final reconciliation with respect to Terex's obligations under the residual value guarantee.  Simultaneously, Terex and URI prepared a final reconciliation with respect to URI's obligations under the backup remarketing agreement.

On December 31, 2002, Apuzzo signed a "Contract" between URI and Terex that purported to close out the remarketing and purchase agreements between the two companies.  Calling the document Apuzzo signed a "Contract" made it impossible to determine if the document related to the close-out of any transaction.  The Contract provided that URI would make a $8 million "prepayment," to be applied as a "surcharge" on the purchase of additional equipment from Terex in the following six months.  It further provided that Terex could keep the prepayment even if URI failed to make the additional purchase. Apuzzo knew that the characterization of the $8 million as a "prepayment" and "surcharge" was intended to disguise to real purpose of the payment: covering Terex's losses under the remarketing agreement with GECC.

### Terex II

In December 2001, as the fiscal year for both URI and Terex was coming to an end, Apuzzo participated in a second three-party sale-leaseback transaction, which was engineered to enable URI to meet its fourth quarter and year-end earnings guidance

and to permit Terex to make a large year-end sale of new equipment to URI.  Terex II was structured similarly to the Terex I transaction: (1) URI sold used equipment to GECC and leased it back for a short period; (2) Terex agreed to remarket the equipment and provide GECC with the same residual value guarantee it had previously made; and (3) URI agreed to purchase new equipment from Terex and to indemnify Terex for the losses it was expected to incur under the residual value guarantee.

As before, the agreements were structured to conceal the interlocking nature of the three-party transactions.  In particular, the documents failed to disclose the effective quid pro quo between Terex's agreement with GECC to remarket the equipment and provide a residual value guarantee, and URI's agreement to both purchase new equipment from Terex and indemnify Terex for its losses under the residual value guarantee.

Just as with Terex I, in which the transaction documents were edited to remove references to the interlocking nature of the agreements, Apuzzo signed the Terex II remarketing agreement knowing that it made no reference to URI's commitment to indemnify Terex.  Moreover, Apuzzo understood that URI continued to want the agreements to be kept separate.  On December 19, 2001, Apuzzo received an email from the Terex sales manager who was engaged in the negotiations with URI, which specifically

noted that the URI sales manager wanted the transactions "on two separate documents."  (Compl. ¶ 42).  Consistent with this goal, URI's commitment to indemnify Terex was not disclosed in the "bill and hold" letter, dated December 21, 2001, URI sent in connection with its agreement to purchase new equipment from Terex.

Prior to entering into the agreements in connection with Terex II, Terex had determined that the valuation of the used equipment being sold to GECC by URI was above the fair market value and would likely cause Terex losses in excess of $4 million as a result of Terex's promise that GECC would receive pursuant to the remarketing agreement at least 96% of the purchase price GECC was paying to URI.  Before agreeing to provide GECC with the residual value guarantee, Terex insisted that URI agree to indemnify Terex for this anticipated loss. Apuzzo received internal email communications disclosing the materially lower appraisals of the used equipment being sold to GECC and the imposition of a $4 million "premium" on the sale of $24 million of new equipment being sold by Terex to URI covering the corresponding shortfall Terex expected as a result of the residual value guarantee.

On December 27, 2001, the day before the sale-leaseback and remarketing agreements were executed, Apuzzo received an email from a Terex employee notifying GECC and others that the

equipment list submitted by URI to GECC, which listed the equipment for which Terex was providing the residual value guarantee, contained "correct values."  (Compl. ¶ 44). Notwithstanding this communication to GECC, Apuzzo signed the remarketing agreement between Terex and GECC knowing that it did not disclose the materially lower appraisals that Terex had obtained, the likelihood of substantial losses to Terex pursuant to the residual value guarantee, and URI's commitment to indemnify Terex for those losses.

Apuzzo received internal Terex communications discussing the payment of a $4 million "premium" on the purchase of $24 million of new equipment.  As in the Terex I transaction, Terex issued inflated invoices showing the aggregate purchase price of the new equipment to be $28 million, without disclosure of the purported $4 million "premium".  As before, the disguising of the indemnification payment was done with Apuzzo's knowledge.

While Terex sales managers negotiated directly with their URI counterparts concerning many of the details of the transaction, Apuzzo was involved throughout the process, in discussions with Nolan, monitoring email communications, and maintaining control over the final terms of the agreements.  On December 29, 2001, the day after the agreements were executed and Apuzzo signed the agreement with GECC on behalf of Terex, in an email to one of Terex's senior officers, Apuzzo reported on

the successful conclusion of the negotiations, noting in particular that Terex had generated cash from the sale to URI that would be credited to cash at year end.  As with the Terex I transaction, Apuzzo improperly recorded revenue from the sale of the new equipment to URI to improve Terex's reported year-end financial results.

**Apuzzo's Disclosures**

Apuzzo informed Terex's auditors, Pricewaterhouse Coopers ("PwC"), of certain aspects of Terex's transactions with GECC and URI.  Apuzzo informed PwC of the interrelated nature of the agreements and the fact that the invoices did not segregate the payments from URI into revenue and reserve.  Additionally, Apuzzo told Gregg Agens, the PwC partner performing the Terex audit, that Terex was selling equipment to URI and that Terex was anticipating a shortfall in the transaction with GECC, so $5 million of the sales price from URI was going to be set aside in reserve.  In addition to discussing aspects of the transactions with PwC, Apuzzo provided PwC with Terex's remarketing agreement with GECC and various documents related to the sale of equipment to URI.

However, Apuzzo did not disclose other aspects of the transactions to PwC, such as that no purchase agreement was prepared between Terex and URI, that URI did not issue a purchase order, and that Terex had agreed to allow URI to

substitute or return equipment to Terex such that the
transactions failed to comply with requirements for "bill and
hold" accounting.  Additionally, despite the fact that Apuzzo
"kn[ew] that URI intended to book or had booked the two
transactions improperly" (Reply Mem. at 1), when asked by Agens
whether he knew how URI intended to account for the
transactions, Apuzzo said something to the effect of "I have no
idea how [URI] intends to account for these transactions."
(Agens Dep. (Doc. No. 78-2) at 52-53).

    In addition to making certain disclosures to PwC, Apuzzo
also informed Terex's CEO Ron DeFeo and assistant general
counsel Jeffrey Gershowitz of the transaction.  With regard to
DeFeo, Apuzzo "copied [him] . . . on emails discussing the 2000
transaction and kept him fully informed about the transaction's
structure."  (Apuzzo Decl. (Doc. No. 80) at ¶ 9).  As to
Gershowitz, Apuzzo informed him about certain elements of the
transaction and asked him to review the remarketing agreement
between Terex and GECC and the remarketing agreement between
Terex and URI.  Apuzzo asked Gershowitz to review the two
remarketing agreements "to make sure that the legal documents
were drafted to reflect the business deal, as [Gershowitz] was
informed, but there was no solicitation of [his] input on the
structure of the transaction."  (Gershowitz Dep. (Doc. No. 88-1)

at 33).  Gershowitz and Apuzzo did not discuss the accounting treatment of the transaction.

### Apuzzo's Conduct After the Transactions

In September 2005, Apuzzo resigned from Terex in connection with Terex terminating the employment of the people who had worked in the corporate finance organization at Terex during the time of the transactions at issue in this case.  Since his resignation, Apuzzo has not been an officer or director of a public company, and he has not violated the securities laws since the conduct at issue here.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  See Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).  Rule 56(a) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court may not try issues of fact.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge."  Anderson, 477 U.S. at 255.  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution."  Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact.  Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248 (internal quotation marks omitted).  A material fact is one that would "affect the outcome of the suit under the governing law."  Id.  As the Court observed in Anderson: "[T]he

-15-

materiality determination rests on the substantive law, [and] it
is the substantive law's identification of which facts are
critical and which facts are irrelevant that governs." Id.
Thus, only those facts that must be decided in order to resolve
a claim or defense will prevent summary judgment from being
granted.  When confronted with an asserted factual dispute, the
court must examine the elements of the claims and defenses at
issue on the motion to determine whether a resolution of that
dispute could affect the disposition of any of those claims or
defenses.  Immaterial or minor facts will not prevent summary
judgment.  See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d
Cir. 1990).

    When reviewing the evidence on a motion for summary
judgment, the court must "assess the record in the light most
favorable to the non-movant and . . . draw all reasonable
inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d
33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v.
Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).  Because
credibility is not an issue on summary judgment, the nonmovant's
evidence must be accepted as true for purposes of the motion.
Nonetheless, the inferences drawn in favor of the nonmovant must
be supported by the evidence.  "[M]ere speculation and
conjecture is insufficient to defeat a motion for summary
judgment." Stern v. Trs. of Columbia Univ., 131 F.3d 305, 315

(2d Cir. 1997) (quoting <u>Western World Ins. Co. v. Stack Oil,</u>
<u>Inc.</u>, 922 F.2d 118, 121 (2d. Cir. 1990) (internal quotation
marks omitted)).

## III. <u>DISCUSSION</u>

### A.  **Injunctive Relief**

The defendant argues that "the record conclusively
demonstrates that [injunctive relief is] not appropriate in this
case" and therefore the plaintiff is not entitled to such relief
as a matter of law.  (Def.'s Mot. for Partial Summ. J. (Doc. No.
77) at 1).  The court disagrees.

Section 21(d)(1) of the Exchange Act gives courts the
authority to prohibit individuals from serving as officers and
directors of public companies.  The section provides:

> Whenever it shall appear to the Commission that any
> person is engaged or is about to engage in acts or
> practices constituting a violation of any provision of
> this chapter, the rules or regulations thereunder
> . . . it may in its discretion bring an action . . .
> to enjoin such acts or practices, and upon a proper
> showing a permanent or temporary injunction or
> restraining order shall be granted without bond.

15 U.S.C. § 78u(d)(1).  "The Second Circuit has held that [the]
language ['is engaged or is about to engage in acts or
practices'] 'requires a finding of "likelihood" or "propensity"
to engage in future violations.'"  <u>U.S. S.E.C. v. Landberg</u>, 836
F. Supp. 2d 148, 158 (S.D.N.Y. 2001) (quoting <u>S.E.C. v.</u>
<u>Commonwealth Chem. Sec., Inc.</u>, 574 F.2d 90, 99 (2d Cir. 1978)).

To support such a finding, the S.E.C. is required "to go beyond the mere facts of past violations," Commonwealth Chem., 574 F.2d at 100, but "fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations." S.E.C. v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1100 (2d Cir. 1972). "In determining whether there is a reasonable likelihood of future violations, a district court may consider: (1) the egregiousness of the violation; (2) the degree of scienter; (3) the isolated or repeated nature of the violations; and (4) the sincerity of defendant's assurances against future violations." S.E.C. v. Haligiannis, 470 F. Supp. 2d 373, 384 (S.D.N.Y. 2007) (citing S.E.C. v. Cavanagh, 155 F.3d 129, 135 (2d Cir. 1998)).

In the present case, the parties do not, for purposes of the instant motion, disagree about the facts themselves, but they do disagree about what the facts suggest and how they would weigh in favor of or against each factor. Thus, there are genuine issues of material fact as to Apuzzo's degree of scienter, whether the "nature of the violation" was "isolated or repeated," the sincerity of any assurances against future violations, and whether he is likely to offend again in the future.

Apuzzo's own submissions show that there exists a genuine issue of material fact as to his degree of scienter. In his memorandum in support of the instant motion, Apuzzo argues that

because he acted with transparency regarding the transactions, his "conduct was the opposite of the clandestine behavior that indicates a higher degree of scienter." (Mem. Supp. Mot. Summ. J. (Doc. No. 78) at 11). However, in his reply memorandum, Apuzzo states that "[t]he SEC alleges (and Mr. Apuzzo accepts as true) that he acted with a high degree of scienter." (Reply Mem. at 3).

Additionally, to the extent Apuzzo concedes that he acted with a high degree of scienter, Apuzzo argues that injunctive relief is unavailable because the fact that over a decade has passed since the alleged wrongdoing "weighs heavily against a finding of a likelihood of future misconduct." (Reply Mem. at 2). While the passage of time without further violations is a factor which the court may consider, this factor is not dispositive, or it would not be one of four factors. In addition, here this factor cannot be accorded sufficient weight as a matter of law so as to necessarily outweigh Apuzzo's "high degree of scienter," especially given the fact that Apuzzo has not been employed at a public company since 2005 and therefore has had little opportunity to violate the securities laws.

Another factor which the court may consider is the sincerity of the defendant's assurances against future violations. Although Apuzzo does not specifically address how the court can be assured that he will not engage in violations

in the future, he argues that the isolated nature of his conduct and the fact that there have been no allegations of fraud against him since the conduct that is the basis of the current litigation suggest that it is unlikely that he will violate again in the future.  However, while the SEC points to Apuzzo's continuing disavowal of his role in the fraud, the court has not had an opportunity to hear directly from Appuzo on this issue and is therefore unable to assess his sincerity.

As to whether the "nature of the violation" was "isolated or repeated," the court's determination will depend on the totality of the circumstances, including the court's assessment of Apuzzo's explanation with respect to various contentions made by the SEC.

Because there are genuine issues of material fact with respect to three of the four factors the court may consider in determining whether there is a likelihood of future violations, and the court will consider the totality of the circumstances, Apuzzo's motion for partial summary judgment on the request for injunctive relief is being denied.

### B.   Officer and Director Bar

As with the request for injunctive relief, Apuzzo argues that an officer and director bar is not appropriate based on the record before the court, and therefore the plaintiff is not

entitled to such relief as a matter of law. (<u>See</u> Def.'s Mot.

for Partial Summ. J. at 1). Again, the court disagrees.

Pursuant to Section 21(d)(2) of the Exchange Act, a court

may

> prohibit, conditionally or unconditionally, and
> permanently or for such period of time as it shall
> determine, any person who violated section [10(b)] of
> this title or the rules or regulations thereunder from
> acting as an officer or director of any issuer that
> has a class of securities registered pursuant to
> section [12] of this title or that is required to file
> reports pursuant to section [15(d)] of this title if
> the person's conduct demonstrates unfitness to serve
> as an officer or director of any such issuer.

15 U.S.C. § 78u(d)(2). In other words, a person may be barred

or suspended from serving as an officer or director of any

public company if that person violated the antifraud provisions

of section 10(b) and displays unfitness to serve as an officer

or director. <u>See</u> <u>S.E.C. v. Dibella</u>, No. 3:04cv1342, 2008 WL

6965807, at *7 (D. Conn. Mar. 13, 2008). The Second Circuit has

identified six non-exclusive factors that may assist courts in

determining whether an individual is unfit to serve:

> (1) the egregiousness of the underlying securities law
> violation; (2) the defendant's repeat offender status;
> (3) the defendant's role or position when he engaged
> in the fraud; (4) the defendant's degree of scienter;
> (5) the defendant's economic stake in the violation;
> and (6) the likelihood that misconduct will recur.

<u>S.E.C. v. Patel</u>, 61 F.3d 137, 141 (2d Cir. 1995) (internal

quotation marks omitted). In addition to being non-exclusive,

the Second Circuit has stated that it is "not necessary to apply

all these factors in every case." <u>S.E.C. v. Bankosky</u>, 716 F.3d
45, 48 (2013) (internal quotation marks omitted).  "[A] district
court may determine that some of [the] factors are inapplicable
in a particular case and it may take other relevant factors into
account . . . in deciding whether to impose the bar and, if so,
the duration." <u>Id.</u>

The analysis regarding whether an officer and director bar
is appropriate substantially overlaps with respect to injunctive
relief.  Because there are genuine issues of material fact with
respect to at least three of the six non-exclusive factors that
may be of assistance to the court in determining whether Apuzzo
is unfit to serve as an officer or director, and the court will
consider the totality of the circumstances and in doing so will
have to make a determination as to how much weight to place on
each of those non-exclusive factors, Apuzzo's motion for partial
summary judgment on the request for an officer and director bar
is being denied.

IV. <u>**CONCLUSION**</u>

Accordingly, for the reasons set forth above, the
defendant's Motion for Partial Summary Judgment (Doc. No. 77) is
hereby DENIED.

It is so ordered.

Signed this 31st day of March, 2014 at Hartford,
Connecticut.

_____/s/_____
Alvin W. Thompson
United States District Judge